UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

S.H. LEGGITT COMPANY d/b/a
MARSHALL GAS CONTROLS and
MARSHALL BRASS,

                        Plaintiff,                       Case No. 1:03-CV-294

v.                                            HON. DAVID W. McKEAGUE

FAIRVIEW FITTINGS AND
MANUFACTURING, INC.,

                        Defendant.

_____/

## OPINION

The plaintiff in this case, S.H. Leggitt Co. d/b/a Marshall Gas Controls and Marshall Brass ("Marshall"), brings claims of trademark violation and unfair competition under § 43(a) of the Lanham Act.  15 U.S.C.A. § 1125 (West 1998 & Supp. 2004).  First, Marshall claims that the defendant, Fairview Fittings and Mfg., Inc. ("Fairview"), has wrongfully copied the design and appearance of two different RV natural-gas regulators and misappropriated the numerical designations that Marshall assigns to those RV gas regulators.  Marshall initially brought claims of trademark infringement for use of the word "Marshall," and a dilution claim under 15 U.S.C. § 1125(c).  Marshall voluntarily withdrew the latter two claims.  Fairview has moved for summary judgment pursuant to Fed. R. Civ. P. 56 on each of plaintiff's remaining claims.  For the reasons that follow, the Court will deny Fairview's motion.

## I. Facts

Marshall and Fairview manufacture, market, distribute and sell two-stage propane regulators.

-1-

The regulators are used to reduce the pressure from the Liquid Propane Gas ("LPG") tank, particularly for recreational vehicles ("RV's").  Marshall has developed, manufactured and sold regulators since 1965.  Two specific designs are at issue in this case: the Marshall models 254 and 290 regulators.

Marshall changed the design of its models 254 and 290 regulators in 1998 to comply with new UL standards.  According to Randy Wheaton, Marshall's director of sales and marketing of the Marshall Gas Controls division, the redesign of the models 254 and 290 (formerly 234 and 260) was instigated by the engineering group.  From 1999 until mid-2004, Marshall sold almost 3.4 million model 254 and 290 regulators.  Each regulator has distinctive features, which constitute the alleged trade dress at issue in this case.  Specifically, Marshall claims that with regard to the model 254, there are twenty visual features that form the trade dress in question.  Those features include: (1) Body lip around perimeter of each stage covering the bonnet edge; (2) Tower on first stage is slightly higher than tower on the second stage; (3) Coordination of color of selector lever, dust cap and indicator housing cap; (4) Generally rectangular body; (5) Flat stepped plateau around tower; (6) Black selector lever; (7) Lobed selector lever; (8) Tower sides having opposing tower lobes flush with tower on one side and blended with tower on the other; (9) Tower lobe tops stepped down from tower top; (10) Indicator housing height about the same as its diameter; (11) Black cap to cover majority of indicator housing; (12) Stepped, separated inlet bosses on underside; (13) Broad flat bottom; (14) Bonnet-body junction is scalloped; (15) Vent which is flared, is along the longitudinal axis of the regulator, merges with the tower and radially extends to the edge of the bonnet; (16) Tower diameter and flared vent opening diameter are about the same; (17) Tower extends above

flared vent; (18) Gradually sloping convex bonnet from outside flat and rounded to tower; (19) Rectangular channel below the outlet and along the longitudinal axis of the regulator; (20) Black dust cover on tower top.   (Exs. P, R.)

Marshall claims that with regard to the model 290, there are fourteen visual features that form the trade dress in question.   These features include: (1) Body lip around perimeter of each stage covering the bonnet edge; (2) Tower on first stage is slightly higher than tower on the second stage; (3) Bonnet body junction is scalloped; (4) Flat stepped plateau around tower; (5) Gauge tap at the three o'clock orientation; (6) Vent hole at the six o'clock orientation on the tower; (7) Stepped inlet bosses on underside; (8) Broad flat bottom; (9) Vent which is flared, is along the longitudinal axis of the regulator, merges with the tower and radially extends to the edge of the bonnet; (10) Tower diameter and flared vent opening diameter are about the same; (11) Tower extends above flared vent; (12) Gradually sloping convex bonnet from outside flat and rounded to tower; (13) Rectangular channel below the outlet and along the longitudinal axis of the regulator; (14) Black dust cover on tower top.  (Exs. P, R; Lee Dec., ¶ 24.)

Marshall sells a majority of the gas regulators that are used in the RV industry. According to Marshall, between 1999 and 2004, it sold 3.4 million units incorporating the alleged trade dress, generating approximately $43 million in sales.  (Pl.'s Br. in Opp'n of Summ. J. at 12; Wheaton Delc. ¶¶3-4; Exs. AA, BB.)  Marshall and Fairview advertise their regulators in *RV Trade Digest*.  Marshall claims that it spent approximately $500,000 advertising, promoting and featuring its models 254 and 290 regulators.  Fairview disputes this claim, stating that the $500,000 represents the overall cost of publishing catalogs, where the models 254 and 290 were but two examples out of many pages in the catalogs.

Marshall sells its regulators primarily through three distributors, who in turn, sell the regulators to RV original equipment manufacturers, who in turn sell to RV dealers. The dealers then sell the regulators directly to end-users. Fairview competes directly with Marshall. The two companies attend the same trade shows. Fairview sells its regulators directly through RV aftermarket distributors, who in turn, sell to RV dealers and aftermarket retailers.

According to Marshall, there are several alternative regulator designs, apart from Fairview's, that compete against the 254 and 290 regulators. These include: (1) Grand Hall "Hurricane" 6000 and 6020; (2) TPA ACR-6; (3) Sherwood 730C and 720C; (4) Cavagna 528C; (5) Fisher R332; (6) REGO 7525; (7) Reca 300 MJ; (8) ASC; (9) Precimex 3001; (10) Fujikoh. Private labeling is not uncommon in the RV industry. Marshall has presented evidence that shows that it would be easy to assume that Fairview's regulators were manufactured for Marshall under a license from Marshall.

Fairview was a former Canadian distributor of Marshall 254 and 290 Regulators. In early 2001, Fairview's president Leslie Woodward met with Asheesh Dabriwal, Director of DHP Financial Services, Ltd. ("DHP"), an Indian manufacturer. Fairview asked DHP to make regulators for Fairview and subsequently sent DHP samples of Marshall's 254 and 290 regulators. Fairview's regulators were finished in July 2002. Fairview sold the regulators using the model numbers "GR-254-00" and "GR-2900-00." Marshall states that to date, there are at least seventeen instances of confusion, eleven of which arose from mistaken returns to Marshall of Fairview regulators.

Fairview argues that RV dealers do not care about the visual appearance of the regulators and do not purchase regulators based on visual appearance. Several individuals have stated in declarations or depositions that they recognize the models 254 and 290 regulators as coming from Marshall on sight. (Pl.'s Br. in Opp'n of Summ. J. at 9-10; Foland Tr., Ex. FFFF at pp. 14, 18;

-4-

Schaeffer Tr., Ex. KKKK at pp. 17-18, 21, 42-43; Kuhn Tr., Ex. LLLL at pp. 21-36; Ex. R, Q; Thatcher PI Decl., at ¶8; Fribley PI Decl., at ¶5; Peterson Expert Report, Ex. JJ at ¶Q, Pliska Decl., at ¶4; Fisher Decl. At ¶¶8, 9, 11; Marton Decl., at ¶¶7-9.)  Some customers purchase Marshall's regulators because they know they are getting a quality product. (Fisher Decl. at ¶¶8, 11; Marton Decl., at ¶¶7, 9.)  Similarly, the same customers stated that they buy Marshall regulators because they believe them to be of a high quality.  *Id*.

## II. Analysis

### A. Standard of Review

Summary judgment is proper if the non-moving party has failed to raise a genuine issue of material fact as to any element of the claim, and the moving party is thereby entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The facts must be construed most favorably to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586  106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 154 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  The plaintiff must come forth with more than a "mere scintilla" of evidence to create a genuine issue of material fact.  *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505.

The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348.  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S. Ct. 2505.

## B. Overview of Plaintiff's Trade Dress Claim

The Lanham Act, Section 43(a), 15 U.S.C.A. § 1125(a), protects a product's trade dress from a competitor's infringing design. A plaintiff must prove the following three elements by a preponderance of the evidence in a trade dress infringement action: (1) that the trade dress has acquired a 'secondary meaning;' (2) that there is a likelihood of confusion based on the similarity of the plaintiff's and defendant's products; and (3) that the appropriated features of the trade dress are primarily nonfunctional. *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (citing *Kwik-Site Corp. v. Clear View Mfg. Co.*, 758 F.2d 167, 178 (6th Cir. 1985)). To avoid summary judgment in favor of the defendant, the plaintiff "must show a genuine issue of material fact as to each of these [three elements]." *Gray v. Meijer*, 295 F.3d 614, 645 (6th Cir. 2002). Fairview claims that Marshall has failed to raise a genuine issue of material fact on all three elements and nearly all the determining factors therein.

## C. Secondary Meaning

A trade dress claim involving design or product configuration is never inherently distinctive; a secondary meaning must be shown. *See Walmart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 216, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000). "'[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982). The visual appearance of

the product and its related design must cause the consumer to recognize the source in the affirmative. *See, e.g., Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991). This means that when an article of merchandise is shown to a prospective customer it must prompt the affirmation, 'That is the article I want *because I know its source*,' and not the negative inquiry as to 'who makes that article?' In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it. *West Point Mfg. Co. v. Detroit Stamping Co.,* 222 F.2d 581, 595 (6th Cir. 1955) (citation omitted).

The Sixth Circuit uses a seven-factor balancing test to determine whether secondary meaning has been established. *Herman Miller v. Palazzetti Imports and Exports*, 270 F.3d 298, 311 (6th Cir. 2001). The plaintiff must show the product design has assumed a secondary meaning through: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the marketplace; and (7) proof of intentional copying. *Id.* at 311-12 (citing *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999) (*TrafFix II*), *rev'd on other grounds*. "No single factor is determinative and every one need not be proven." *Id.* at 312 (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)).

### 1. Direct consumer testimony

"Direct consumer testimony 'need not take the form of explicit testimony from consumers stating that 'I care that X produced this product.''" *See Herman Miller*, 270 F.3d at 312 (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 294 (7th Cir. 1998)). The relevant inquiry is whether the product design causes the consumer to associate it with a particular source and that

the consumer relies on the knowledge of that source in making the decision to purchase. *See Esercizio*, 944 F.2d at 1239.

Fairview argues that the testimony of its RV manufacturers establishes that they don't care about or buy regulators based on visual appearance, and that its customers indicate that they do not identify the particular look of a regulator as being from Marshall. (Lane Decl. ¶6; Courtney Decl. ¶4.) Nine individuals testified for Marshall, that they recognize the models 254 and 290 regulators as coming from Marshall on sight. (Pl.'s Br. in Opp'n of Summ. J. at 9-10; Foland Tr., Ex. FFFF at pp. 14, 18; Schaeffer Tr., Ex. KKKK at pp. 17-18, 21, 42-43; Kuhn Tr., Ex. LLLL at pp. 21-36; Ex. R, Q; Thatcher PI Decl., at ¶8; Fribley PI Decl., at ¶5; Peterson Expert Report, Ex. JJ at ¶Q, Pliska Decl., at ¶4; Fisher Decl. At ¶¶8, 9, 11; Marton Decl., at ¶¶7-9.) Furthermore, two individuals assert that they decide to purchase Marshall's regulator because they know that when they see it they are getting a quality product. (Fisher Decl. At ¶¶8, 11; Marton Decl., at ¶¶7, 9.) It is quite clear that there is evidence regarding this factor in the record that supports Marshall's claim. Because it is not the job of this Court to weigh the evidence, the Court finds that this factor weighs against granting summary judgment.

## 2. Consumer Surveys

Marshall concedes that it does not rely on any consumer surveys. (Pl.'s Br. in Opp'n of Summ. J. at 10). The lack of empirical data of actual consumer surveys does not necessarily destroy a trade dress claim at summary judgment. *See Herman Miller*, 270 F.3d at 313 (finding for plaintiff even though plaintiff produced no consumer surveys). This Court assigns little weight to this factor.

### 3. Exclusivity, Length and Manner of Use

A product can assume a secondary meaning where the use of the mark or trade dress has been for more than a relatively short period of time.  *See Herman Miller*, 270 F.3d at 313 (citing *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989)); *see also WLWC Centers, Inc. v. Winners Corp.*, 563 F. Supp. 717, 723 (M.D. Tenn. 1983)(holding that three years of exclusive use was insufficient); *see also DeGidio v. West Group Corp.*, 191 F. Supp. 2d 904, 915 (N.D. Ohio 2002)(noting that three years was not enough); *Cf. Herman Miller*, 270 F.3d at 313 (noting that the plaintiff had produced the furniture designs since 1956, the defendant's knockoffs were introduced in 1989, a span of approximately thirty-three years).

Marshall states that it has a dominant market share and has exclusively used the trade dress in question for five years.  While two courts have held that three years of exclusive use is not enough to establish secondary meaning, *see DeGidio, supra, WLWC, supra,* Fairview has not shown a lack of a genuine issue of material fact regarding this element.  Instead, Fairview ignores this issue and focuses on the lack of a trademark and Marshall's motivation for selecting the design.  When viewing the evidence regarding this factor in a light most favorable to Marshall, the Court finds that five years of exclusive use, when viewed in connection with the other evidence in this case, favors a denial of summary judgment.

### 4. Amount and Manner of Advertising

The amount of advertising and marketing that a party puts into a particular product may strengthen its claim that the product has assumed a secondary meaning.  *See, e.g.*, *Marketing Displays, Inc. v. TrafFix Devices*, Inc., 971 F. Supp. 262, 268 (E.D. Mich. 1997) (*TrafFix I*), *rev'd on other grounds*.  The party needs to show that the amount spent was more than what was merely

needed to survive in the market.  *See, e.g., Appalachian Log Homes,*871 F.2d 590, 596 (observing $100,000 in ads and expenses was not enough without more proof that it was beyond bare minimum to survive in the market).

Marshall alleges that it spent $380,000 on advertising its models 254 and 290 regulators. Fairview argues that Marshall only spent between $5,800 and $7,000 in advertising its models 254 and 290 regulators and that plaintiff's claim fails because its ads failed to "tout" the visual appearance of its regulators.  Plaintiff has submitted sufficient proof to raise a question of fact over the amount of advertising spent on the trade dress of the model 254 and 290 and whether this advertising led to consumer association of the regulators with Marshall.  (Wheaton Decl.; Ex. DD.) Accordingly, the Court finds that the evidence regarding this factor weighs against granting summary judgment.

### 5. Amount of Sales and Number of Customers

Evidence of volume of sales standing alone is not sufficient to show a product has a secondary meaning.  *See Herman Miller*, 270 F.3d at 313-14.  In *Herman Miller*, the plaintiff sold over100,000 units over a period of roughly thirty-three years.  The court found that in conjunction with other evidence showing secondary meaning, this evidence added credibility to the finding of secondary meaning.  *See id.* at 314.  However, in *Appalachian Log Homes,*$2,000,000 in gross sales over two years was insufficient to establish secondary meaning.  871 F.2d at 595.

Marshall argues that it sold 3.5 million units incorporating the alleged trade dress, generating approximately $43 million in sales.   (Pl.'s Br. in Opp'n of Summ. J. at 12; Wheaton Decl. ¶¶3-4; Exs. AA, BB.) Fairview asserts that Marshall's large volume of sales do not indicate that the design is associated with the product's source in the mind of the purchaser. (Def.'s Am. Br. in Supp. of

Summ. J. at 16.) While Marshall may not prove its case based on its sales evidence alone, it does lend support to Marshall's claim.

### 6. Established Place in the Marketplace

Fairview asserts that Marshall's established status in the market place should be afforded little weight because Marshall was a virtual monopolist in the market before Fairview's arrival. (Def.'s Am. Br. in Supp. of Summ. J. at 17.) Fairview points out that any dominant market share that Marshall has enjoyed is not necessarily due to the regulators having achieved a secondary meaning in the minds of the consumers; rather it is because Marshall was the only producer on the market. However, this assertion explains the reason behind Marshall's established position, and does not show that Marshall did not occupy such a position. Marshall's establishment in the marketplace, supports a finding of secondary meaning. *See Winchester Fed. Sav. Bank v. Winchester Bank, Inc*., 2004 WL 3209035 (E.D. Ky. 2004).

### 7. Intentional Copying

Proof of intentional copying creates a presumption of secondary meaning. *See Esercizio*, 944 F.2d at 1239; *McNeil-PPC, Inc. v. Guardian Drug Co.,* 984 F. Supp. 1066, 1069 (E.D. Mich. 1997); *DAP Prods. v. Color Tile Mfg.*, 821 F. Supp. 488, 492 (S.D. Ohio 1993). Mere knowledge of the existence of a competitors design is insufficient to show intent. *See DeGidio v. West Group Corp.*, 355 F.3d 506, 514 (6th Cir. 2004). There must be proof of the intent to copy in order to derive benefit from the plaintiff's good will. *Id.* The presumption is rebuttable if the defendant can show that there is some logical reason for copying other than deriving benefit from the plaintiff's reputation. *See Libbey Glass, Inc. v. Oneida Ltd*., 61 F. Supp. 2d 700, 708 (N.D. Ohio 1999) (citing *Esercizio*, 944 F.2d at 1239).

Marshall argues that Fairview used Marshall's 254 and 290 regulators as models to copy when it met with its designer, and that the designer's testimony that the design similarities are mere coincidence is not credible.  (Pl.'s Br. in Opp'n of Summ. J at 13; Bhardwaj Tr., Ex. ZZZZ at 119-20).  Mr. Bhardwaj stated that the dimensions were mere coincidence and were a result of the properties inherent in the regulators' function.  (Bhardwaj Tr., Ex. ZZZZ at 119-20.)  Marshall contends that the fact that Fairview coupled the copied designs with practically the same identification numbers adds support to the allegations.  (Pl.'s Br. in Opp'n of Summ. J at 14.)  Marshall argues that Fairview sent Marshall regulators to its Indian manufacturer for the purpose of copying the design. (Ex. OO; Ex. PP, Ex. TTTT at 21-22.)

After reviewing the evidence presented by each side, it is clear that this factor weighs in Marshall's favor, at least for purposes of this motion.  While Fairview stamped its name and logo on the regulators themselves and the regulators' packaging, there is evidence in this record that could support the claim that Fairview intended to copy Marshall's regulators.  Accordingly, the Court finds that this factor supports Marshall's argument that its regulators have secondary meaning.

### 8. Conclusion Regarding Secondary Meaning

The factors set forth above do not indicate a lack of a genuine issue of material fact as to secondary meaning.  There is sufficient evidence indicating that Marshall established a connection between itself and the two regulators at issue in this case. Therefore, the Court declines to grant summary judgment in Fairview's favor on this element.

### D. Likelihood of Confusion

Eight factors guide the Court in determining whether there is a likelihood of confusion. Those factors include: (1) Strength of the plaintiff's mark; (2) Relatedness of the goods; (3)

-12-

Similarity of the marks; (4) Evidence of actual confusion (5) Marketing channels used (6) Likely degree of purchaser care; (7) Defendant's intent in selecting the mark; and (8) Likelihood of expansion of the product lines. *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,* 280 F.3d 619, 646 (6th Cir. 2002) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1266 (6th Cir. 1985)).  These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.  *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991).  The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.  *Id.*  Summary judgment is appropriate if Marshall is wholly incapable of producing evidence that the design of the regulators is "likely to cause confusion" in prospective purchasers' minds as to the source or sponsorship of the catalog or the goods it contains.  *See TrafFix,* 200 F.3d at 933.

## 1. Strength of Plaintiff's Trade Dress

The protection accorded a mark under the Lanham Act depends upon the "strength" of the mark.  *See Bliss Clearing Niagara, Inc. v. Midwest brake Bond Co,* 339 F. Supp. 2d 944, 964 (W.D. Mich. 2004) (citing *Qualitex,* 514 U.S. 159, 167, 115 S. Ct. 1300).  A mark's "strength" is gauged by its "distinctiveness and degree of recognition in the marketplace." *Homeowners Group, Inc.,* 931 F.2d at 1107.  "'A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.'" *Frisch's Rest.,* 759 F.2d at 1264 (quoting Callman, Unfair Competition, Trademarks & Monopolies, ¶ 20.43 (4th ed. 1983)). The stronger the mark, the greater the likelihood of confusion.  *Gray v. Meijer, Inc.,* 295 F.3d 641,

-13-

646 (6th Cir. 2002) (citing *Homeowners Group, Inc. v. Home Marketing Specialists*, 931 F.2d 1100, 1107 (6th Cir. 1991)).  Advertising, promotional efforts and success in the market are evidence of a strong mark.  *Id.*

Fairview argues that Marshall's trade dress is not strong because people do not buy regulators based on their individual appearance.  The proper inquiry, however, is whether people recognize the trade dress in the marketplace.  Fairview has not shown that people do not recognize the regulators in the marketplace as Marshall regulators.  In fact, Marshall has presented testimony from RV dealers tending to show that people recognize the 254 and 290 regulators as being manufactured by Marshall.  (Marton Decl.; Fisher Decl.)  Marshall has also presented evidence that shows its regulators are unique.  (Exs. G, H, J, L.)  Accordingly, the Court finds that this factor supports a finding of likelihood of confusion.

### 2. Relatedness of the Goods

Fairview concedes that the goods are related.  This factor supports a finding of likelihood of confusion.

### 3. Similarity of the Marks

The similarity of the trade dress relies mainly on the overall image of the product; but a party is not absolved from identifying the particular design features it claims are infringed upon.  *See, e.g., Abercrombie*, 280 F.3d 619, 634-35.  The individual features are not necessarily the focus. *See Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623 (6th Cir. 2002) ("[A] detailed analysis of specific features of a trademark is not appropriate; rather, 'courts must view marks in their entirety and focus on their overall impressions, not individual features.') (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 283 (6th Cir. 1997)).  Thus, the

inquiry is whether the identified features as a whole are infringed upon. *See Id.* A court must determine, in the light of what occurs in the marketplace, whether the mark "will be confusing to the public when singly presented." *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir. 1988).

Marshall has adequately identified the features it claims are infringed upon. Fairview claims that the appearance of "Fairview" on the packaging in which the regulators are shipped, on the regulators themselves and in its advertisements indicates there is no likelihood of confusion. While the packaging of the goods may be relevant to the ultimate question of the likelihood of confusion, Fairview's regulators are almost identical to Marshall's. This factor suggests that confusion could occur and weighs against granting summary judgment.

### 4. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil Co.*, 839 F.2d at 1188; *see also*, *Therma-Scan*, 295 F.3d at 634. When a party presents evidence of actual confusion, it strongly suggests the potential for confusion. *TrafFix Devices, Inc.*, 200 F.3d 929, 935 *rev'd on other grounds,* 532 U.S. 23, 121 S. Ct. 1255. The weight given to such evidence depends, however, upon the type and amount of confusion that occurs. *Therma Scan*, 295 F.3d at 634. The fact that at least some confusion has occurred favors the plaintiff. *Daddy's Junky Music Stores*, 109 F.3d at 284.

There is evidence of some actual confusion in this case. However, the parties have competed in the same area for several years, and seventeen instances of actual confusion does not appear to be an unreasonable amount, given that over 95,000 regulators have been sold and only seventeen have been returned to the wrong party. Ultimately, this factor may weigh in Fairview's favor, but there *is* evidence of actual confusion and the weight to give this testimony is best left to the trier of fact.

### 5. Relatedness of the Marketing Channels Used

A court should consider whether the parties' marketing efforts are similar or different and whether their marketing efforts are designed to reach the same customer base. *Daddy's Junky Music Stores*, 109 F.3d at 285. Fairview does not adequately address this factor. Fairview mentions the "channels of trade," and ignores the fact that Marshall states that the parties promote their regulators at the same trade shows and in the *RV Trade Digest*. The fact that the parties promote the regulators in similar manners favors a denial of summary judgment.

### 6. Likely Degree of Purchaser Care and Sophistication

The general standard used to determine whether this factor indicates the potential for confusion is "the typical buyer exercising ordinary caution." *Homeowners Group*, 931 F.2d at 1111. A higher standard may be required where the buyer has more expertise because the purchaser is more likely to exercise a higher degree of care. *Id.* "The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors." *Daddy's Junky Music Stores*, 109 F.3d at 285.

The parties disagree over the types of purchasers who buy the regulators at issue in this case. Fairview argues the buyers are highly sophisticated. Marshall argues there is a mix of buyers. Given the similarity of the trade dress, the likelihood of confusion seems high regardless of the type of consumer. Marshall has raised genuine issues of material fact over the type of consumer who buys the regulators at issue here and whether such buyers are likely to be confused because of the similarity of the trade dress. Accordingly, this factor also weighs against granting summary judgment.

### 7. Intent in Selecting the Mark

This factor is relevant if a party chooses a mark with the intent of causing confusion. This fact by itself may be sufficient to support an inference of confusing similarity. *Wynn Oil*, 839 F.2d at 1189. Direct evidence of intentional copying is not necessary to prove intent. *Daddy's Junky Music Stores*, 109 F.3d at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.*

For the reasons stated in Section *C. 7., supra,* the Court finds there is a question of fact regarding this factor. Accordingly, this favors a denial of Fairview's motion for summary judgment.

### 8. Likelihood of Expansion

[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group, Inc.*, 931 F.2d at 1112 (quoting Restatement of Torts § 731(b) & comment c (1938)). Marshall does not argue that there is a likelihood of expansion and concedes that the goods already directly compete. Fairview does not address this factor. Accordingly, the Court assigns little weight to this factor.

### 9. Conclusion Regarding Likelihood of Confusion

The factors set forth above, indicate that there are questions of material fact regarding the likelihood of confusion. Therefore, Fairview has failed to show that it is entitled to summary judgment with regard to the likelihood of confusion element of Marshall's trade dress claim.

### E. Functionality

The Lanham Act does not protect trade dress that is functional in nature. Marshall must show the non-functional aspect of the design. *See* 15 U.S.C.A. § 1125(a)(3); *see also Antioch,* 347 F.3d

150, 154; J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:54 (4th ed.). There are two forms of functionality, each of which applies a separate test. The first functionality test turns on whether the design feature "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood*, 456 U.S. 844, 850-51, n.10, 102 S. Ct. 2182. This is known as the "traditional" test. A design feature is functional if it is not "merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix Devices*, 532 U.S. 23, 121 S. Ct. 1255.

The second form of functionality is known as "aesthetic functionality." Under the aesthetic functionality test, a functional feature is "one of the exclusive use of which would put competitors at a significant non-reputation related disadvantage." *Abercrombie*, 280 F.3d 619. The court, in *Abercrombie*, identified two tests for evaluating whether a design was aesthetically functional under the competitive disadvantage theory. The first test requires a determination of whether protection of certain features would leave a variety of comparable alternatives for competitors to use. The second test requires a determination of whether protection of a product's features would hinder effective competition in the market for the product. *Id*. at 642.

Individual features, although functional in their own right, may add up to a non-functional aspect as a whole. *See Antioch*, 347 F.3d at 157-58. To receive protection, the combination of individual functional features must be configured in an arbitrary, fanciful, or distinctive way. *See Antioch*, 347 F.3d at 158 (citing *TrafFix*, 532 U.S. at 34, 121 S. Ct. 1255). Marshall relies on its alleged trade dress as a whole, rather than the individual features. (Pl's Response Br. At 10 n. 3; Lee Decl. at 7.)

-18-

Here, unlike *TrafFix* and *Antioch,* it is not obvious that the features claimed by Marshall are clearly functional.[1]  (*See* Lee Decl. ¶24; Ex. S, Expert Report of Lee at 3-5; Ex. JJ, Expert Report of Petersen at 3-5; Ex. P.)  Fariview argues over the issue of cost and quality of the device.  There are disputed questions of fact regarding whether the cost and quality of the regulators would be different absent the trade dress.  Fairview argues that Marshall's proofs regarding the cost of the regulators are inadequate because Marshall's experts admittedly did not know the manufacturing cost of the regulators, or the regulators of Marshall's competitors.  However, Edward Lee stated in his declaration that the cost and quality of the regulators would not be affected by certain changes to the regulators.  (Lee Decl. ¶¶ 4-17).  This testimony specifically addresses the cost and quality issue raised by Fairview.  It is not appropriate for the Court to weigh this testimony against that of Mr. Dabriwal, who testified for Fairview that the regulators would cost significantly more to produce without the alleged trade dress.

---

[1]      In *Antioch*, the Court stated: "[t]*rafFix Devices* teaches that where an engineering design feature is the core component of the overall trade dress, a court may focus on the functionality of that key feature."  *Antioch*, 347 F.3d at 159.  The design feature that constituted the core component of the overall trade dress in *Antioch* was a "dual strap hinge," that kept the product together.  *Id.*  In *Traffix* Court reasoned that the design of an outdoor sign, which enabled the sign to resist toppling in the wind, was not ornamental but was functional.

Fairview argues that Marshall's engineering group redesigned the regulators, which proves that the design here is functional.  It is clear that the models 254 and 290 regulators were modified in 1998 to comply with new UL requirements, and that the configuration that exists today was a result of those requirements.  However, unlike *Antioch* and *TrafFix* it does not appear that there is an engineering design feature that is the core component of the overall trade dress.  Rather, the overall trade dress involves a multitude of features.  Therefore, the fact that part of the design of the regulators was motivated at least in part by engineering reasons does not prove the design is functional and thereby dictate the outcome of this case.

Furthermore, Fairview does not take issue with or rebut Marshall's evidence that its trade dress is arranged in an arbitrary or fanciful way.  Unlike *Antioch* and *TrafFix*, it is not clear that the trade dress alleged by Marshall is anything other than ornamental and Fairview is not entitled to judgment as a matter of law on this element.

Fairview has not shown a lack of a material fact under the aesthetic functionality test, and in fact, argues that the Court should not apply this test at all.  Fairview does argue  that the regulators manufactured with alternative designs that Marshall cites are used for different purposes than are the Marshall 254 and 290 regulators, and that Marshall "did not meet its burden of proving that the alternatives cost as little to manufacture as Marshall's regulators..." (Defendant's Reply Br. at 11.) However, the question is whether there is a genuine issue of material fact at this point, and not whether Marshall has *proven* anything.  Marshall has presented evidence that shows that Fairview would not be at a significant non-reputation-related disadvantage without the ability to use Marshall's trade dress, and that competition would not be hindered by same.

There are clearly questions of fact on each of the elements of plaintiff's trade dress claim, such that summary judgment is not appropriate.  While Marshall may ultimately fail to convince a trier of fact that it has established all the elements of its trade dress claim, Marshall has presented more than enough evidence to raise a triable issue of fact as to all the elements of its trade dress claim.  Accordingly, the Court will deny Fairview's motion for summary judgment as to Marshall's trade dress claim.

## F. Marshall's Unfair Competition Claim[2]

Plaintiff argues that Fairview's use of Marshall's part numbers constitutes unfair competition under the laws of the United States and the State of Michigan.  Section 43(a)(1)(A) of the Lanham Act prohibits the use of any word, term, name, symbol or device which:

> is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . .

15 U.S.C. § 1125(a)(1)(A).  The applicable standard under Michigan common law is the same as the tests for federal trademark infringement and federal unfair competition under 15 U.S.C. §1125(a): whether confusion is likely.  *See Homeowners Group, Inc.*, 931 F.2d at 1105 n. 1; *see also Goscicki v. Custom Brass & Copper Specialties, Inc.*,  229 F. Supp. 2d 743, 756 (E.D. Mich. 2002).

In order to prevail on its unfair competition claim, Marshall must establish that Fairview's actions create a likelihood of confusion regarding the origin of the goods offered by Marshall and Fairview.  *See Therma-Scan*, 295 F.3d 623, 629 (citing *Daddy's Junky Music Stores*, 109 F.3d 275, 280); *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622-23 (6th Cir. 1996) (explaining that a party seeking to avoid summary judgment in a case alleging trademark infringement and unfair competition, in violation of 15 U.S.C. §§ 1114 and 1125(a), "must establish that genuine factual disputes exist concerning those factors that are material to whether confusion is likely in the marketplace as a result of the alleged infringement"); *see also Wynn Oil*, 943 F.2d 595, 604 (applying "likelihood of confusion" test to unfair competition brought pursuant to 15 U.S.C. § 1125).  The

---

[2]      Marshall originally brought a claim for trademark infringement and trademark dilution of its MARSHALL trademark, but has since withdrawn these claims.

same factors used to determine likelihood of confusion discussed above also apply to trademark claims. *Therma-Scan*, 295 F.3d at 629.

Fairview argues that the parts number issue is "moot," asserting that the fact that Fairview no longer uses the numbers erases any alleged infringing behavior in the past. Fairview also argues that Marshall cannot establish secondary meaning because it has not responded to Fairview's "evidentiary support" of its position that the numbers 254 and 290 do not mean anything.[3]

Fairview appears to base its entire argument related to likelihood of confusion on the testimony of James Kuhn. Fairview asserts that Mr. Kuhn's testimony, that the part numbers mean nothing to him, establishes that there is no confusion regarding the numbers 254 and 290. (Ex. 18, Kuhn Dep., p. 50, 51.) However, Marshall has presented the testimony of other RV dealers that shows that the numbers mean something to those dealers.

The Court finds that the application of the factors stated in *Section D*, *supra*, offers an equally persuasive justification for denying Fairview's motion for summary judgment as to Marshall's unfair competition claim.[4] Marshall has presented evidence addressing all the relevant factors; evidence that Fairview has failed to rebut or even address. Marshall has established that

---

[3]     Defendant relies on an unpublished case from the Third Circuit for the proposition that Marshall cannot prove that its part numbers have acquired secondary meaning. *R & B, Inc. v. Needa Parts Mfg., Inc.* 50 Fed. Appx. 519, 527, 2002 WL 1905361, (3rd Cir. 2002). However, there is no such requirement in the Sixth Circuit.

[4]     The Court notes, that even if plaintiff were required to prove secondary meaning as to the numbers "254" and "290," Marshall has presented evidence from two RV dealers, that the numbers 254 and 290 have acquired a secondary meaning. (Fisher Decl., at 10; Marton Decl., at 10). This evidence refutes Fairview's unsubstantiated claim that Marshall cannot demonstrate secondary meaning of its model numbers.

there are disputed questions of material fact regarding Marshall's unfair competition claim, such that summary judgment is inappropriate on this claim as well.

### III. Conclusion

For all the foregoing reasons, the Court finds that there are genuine issues of material fact on each of Marshall's claims, which preclude summary judgment.  An order consistent with this opinion shall issue forthwith.


Dated: April 22, 2004                                   /s/   David W. McKeague
                                                        DAVID W. McKEAGUE
                                                        UNITED STATES DISTRICT JUDGE